**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>TIMOTHY MCKENZIE,<br><br>    Defendant. | No. 18-CR-1043-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

## *I. INTRODUCTION*

The matter now before me is Defendant's Motion to Suppress Evidence. (Doc. 22.) On October 2, 2018, the grand jury charged Defendant with Possession of a Firearm by a Felon. (Doc. 2-1.) The charge arose from an incident that occurred on a public street in front of Defendant's residence on the evening of July 22, 2018 when Dubuque Police Officer Kim Hoover pat searched Defendant and found a gun on his person.

The Honorable Charles J. Williams, United States District Court Judge, referred this motion to me for a Report and Recommendation. On November 29, 2018, I held an evidentiary hearing on Defendant's motion. The Government called the following witnesses:

- Officer Kim Hoover, Dubuque Police Department
- Officer Brandon Gudenkauf, Dubuque Police Department
- Officer Dylan Doerges, Dubuque Police Department
- Officer Nicholas Schlosser, Dubuque Police Department

Defendant called no witnesses. The Parties were permitted until December 7, 2018 to file supplemental briefs or authorities in support of their positions. I have reviewed the Government's Supplemental Brief. (Doc. 30.) For the following reasons, I respectfully recommend that the Court **grant Defendant's Motion to Suppress.**

## *II. FINDINGS OF FACT*

On the evening of July 22, 2018, the Dubuque Police Department ("DPD") received a call about a black male subject with a gun, approximately 17 years old, and wearing a black shirt on Jackson Street in Dubuque. Dubuque Police Officer Nick Schlosser testified at the hearing, although he did not personally respond to the call. Officer Schlosser is part of the ATF task force. Officer Schlosser referred to the incident as a "disturbance" and stated that a gun had been "displayed." But the evidence regarding what incident the DPD was called to deal with or the crime it may have been investigating is very scanty.

As far as I can determine, officers were dispatched to the neighborhood because someone saw a gun approximately one block from where the incidents described below took place. There was no evidence that anyone brandished or discharged any weapon. There was no evidence regarding the size or the type the gun. There was no evidence regarding the identity, much less the reliability, of the person reporting the incident. In fact, there was no evidence about what crime either the person reporting the gun or the DPD thought might be afoot. Beyond the allegation that someone was seen with a gun, there was no evidence that anyone was suspected of violating any local, state, or federal law regarding possessing, carrying, or using a firearm.

***Officer Kim Hoover's Testimony.*** Officer Kim Hoover has been an officer with the DPD for three and a half years. She is a 2015 graduate of the Iowa Law Enforcement Academy and has an Associate's Degree from Black Hawk College. She has completed field training and is now assigned as a patrol officer. She was dispatched to the call at issue in this case at 8:03 p.m. on July 22, 2018. It was still light out. Officer Hoover

had prior experience responding to calls involving firearms. In her experience, descriptions of suspects are not always accurate because people reporting the incidents "get rattled." As a result, she testified that such reports may inaccurately state the color of the suspect's clothes. Furthermore, she has encountered cases where reports may have been accurate when initially made, but the circumstances have changed by the time the officer arrives. She testified that people can change their shirts or hand off guns to other persons. When one gun is reported, she becomes concerned that others on scene could also possess a gun.

Officer Hoover arrived in the 2100 block of White Street which is about a block from the Jackson Street area where the gun was seen. She considers the neighborhood a high-crime area. There had been a "shots fired" call in the alley one year previously. Officer Hoover testified that fellow DPD Officer Gudenkauf arrived behind or in front of her. When Officer Hoover arrived, she passed by the house where she ultimately encountered Defendant. She asked the police dispatcher for a description again and Officer Gudenkauf told her, "I think it's those guys you just passed." Officer Hoover turned her patrol car around, parked, and "went out" with the subjects. Officer Hoover saw five to six people in the general area, including two black men wearing black shirts. Officer Gudenkauf approached the porch of 2145 White Street where the group was gathered. Unbeknownst to Officer Hoover, this was Defendant's residence.

As Officer Hoover started walking to the area where Officer Gudenkauf was confronting the group, she saw Defendant starting to walk behind an SUV in the same general area where Officer Gudenkauf was headed. She directed Defendant to stop and he stopped. She testified she was concerned because "who knows what he has on him and there's an officer going there." Defendant was wearing a royal blue shirt, royal blue shorts, black shoes, and a blue ball cap. Officer Hoover testified that Defendant appears much older than 17, i.e., the reported age of the suspect. The fact that Defendant was going behind the SUV made her think "something was off." However, she stated there was nothing suspicious about the route Defendant was taking. It was, coincidentally,

3

outside of the area where she could see him clearly. The mere fact that Defendant was outside of her vision for a period of time and moving toward Officer Gudenkauf made Officer Hoover uncomfortable.

Officer Hoover immediately made the decision that she should do a pat down and announced to Defendant her intent to do so and told Defendant to put his hands behind his back. As Officer Hoover reached to start the pat down and Defendant put his hands behind his back, Defendant told Officer Hoover that he had a gun. Officer Hoover performed a pat down and removed the gun from Defendant's waistband as a third officer arrived and handcuffed Defendant.

Officer Hoover testified to her concerns regarding officer safety as follows:

> Anytime we go to a gun call there's a possibility there are more than just one gun there. It could be possibly retaliation or gang affiliations. It could be a wide variety of issues. So, we don't want the gun in anybody else's hands. We want to remove that from the scenario.

(Hoover Nov. 29, 2018 Hr'g Test.) Officer Hoover admitted Defendant did not match the description given by the person who reported the gun. Officer Hoover also admitted that Defendant did not make any threatening gestures and had been fully compliant. The sole reason she patted Defendant down was for officer safety. She testified, "We're always going to do a weapons pat down because we got the call about the gun." She intended to search everybody who matched the description as well as anybody who was in the general area. She intended to pat down anybody she came in contact with in response to such a call, even if they did not match the description, for officer safety. She testified that she considered the nature of the call, the location, and the time of day, and that she would have patted down a twelve-year-old black child or a sixty-year old black man for her safety.

Officer Hoover testified that she was present for an interview with Defendant after he received *Miranda* warnings. Defendant first said he used the gun for deer hunting, but later admitted he kept it for protection because he was a former gang member.

4

***Officer Hoover's Body Camera Video.*** Officer Hoover was wearing a body camera that captured her interaction with Defendant, including the pat down. Government's Exhibit 1 ("Exhibit 1") contains an approximately two-minute clip. The following are my observations from repeated review of this video, which largely corroborates Officer Hoover's testimony regarding the events.

The video shows Officer Hoover as she exits her car parked on a city street. She walks in front of her own vehicle and behind another police vehicle to a sidewalk. She proceeds along the sidewalk behind Officer Gudenkauf toward where the subjects are ultimately encountered. A dark SUV is parked off the street facing the residence where the subjects are standing. Officer Gudenkauf appears to leave the sidewalk on the side of the SUV nearest to Officer Hoover. At about this time, Officer Hoover appears to first notice Defendant on the sidewalk on the far side of the SUV. Officer Hoover shouts, "Hey," to Defendant while he is still several car lengths in front of her and before he is discernable in the video. When he is first discernable, Defendant appears to be walking from the sidewalk to the residence where the other subjects are standing and where Officer Gudenkauf is also headed. Officer Hoover orders Defendant not to go toward the residence as she continues walking toward him. Defendant returns to the sidewalk and waits for Officer Hoover to approach him. When Officer Hoover is approximately ten feet from Defendant (my estimate from the video) she announces that she is going to conduct a pat down. Approximately twelve seconds passes between when Officer Hoover first shouts to Defendant and when she announces she is going to perform a pat down. During this time (and throughout the encounter, as Officer Hoover testified), Defendant was fully compliant, non-threatening, and never attempted to flee. Officer Hoover's body camera shows more of her actions after the initial encounter, but these are not pertinent to the suppression motion.

***Officer Brandon Gudenkauf's Testimony.*** Brandon Gudenkauf is a patrol officer with the DPD. On July 22, 2018 at a little after 8:03 p.m., he responded to a call regarding an individual with a gun. When asked to specifically describe the nature of the

5

call he stated, "I was told a black male had a gun in the area of 21st and White Street." The ultimate encounter with Defendant occurred approximately a block away from where the original call reported the sighting of the gun.

He located and approached a group of at least five men and women, including two men that he believed matched the description. However, he also testified that in his experience, reports are not always accurate because the witness may not have seen who had the gun or the gun could have been passed off to another subject.

Officer Gudenkauf testified that the area is a high crime area that has daily calls for service. When he reviewed Officer Hoover's body camera footage, he was concerned about Defendant walking toward him and would have met him with the other people he was approaching. His concern was based on the fact that he did not know who would have the gun and that he had not seen Defendant approaching him. Officer Gudenkauf's body camera video shows two men with black shirts who ultimately consent to a pat down. His video does not show his full approach to the situation. He was unaware of Officer Hoover's encounter with Defendant until she reported the gun.

Officer Gudenkauf did not interact with Defendant. He testified that he did not pat down the women in the group, but "in a perfect world" he would have patted them down because there could be more than one gun, and the fact that Officer Hoover found a gun did not alleviate that concern.

***Officer Dylan Doerges's Testimony.*** Dylan Doerges is also a patrol officer with the DPD. On July 22, 2018 he responded to a call he described as "a subject with a gun." The call was for a black juvenile with a black shirt and a gun. Officer Doerges acknowledged the differences between Defendant's appearance and this description. Officer Doerges confirmed that Defendant's address is 2145 White Street; i.e., the property where he was encountered and arrested.

Officer Doerges walked on to the scene and saw Officer Hoover interacting with Defendant. He heard her say she had a gun and he immediately detained Defendant by placing him in handcuffs as shown in Exhibit 1. Officer Doerges placed Defendant in

6

his patrol car and transported him to jail. At the jail, he read Defendant his *Miranda* rights and Defendant signed a *Miranda* form. After the *Miranda* warning was given, Defendant responded to questions about the gun. Defendant told Officer Doerges he had purchased the gun for deer hunting.

***Officer Nick Schlosser's Testimony.*** Nick Schlosser is also an officer with the DPD. He has been an officer for more than 15 years. He is currently assigned to criminal investigation and the ATF task force. Officer Schlosser did not respond to the call in question. He was apparently called to testify because of his training and experience in shootings and criminal investigations. He is also intimately familiar with the traffic cameras in the City of Dubuque that he has reviewed in multiple cases. He testified regarding the "tunnel vision" officers often experience on their way to or at the scene. For example, he has seen in traffic camera footage instances where officers drive past a potential suspect who, if officers would have investigated, would have been found in possession of a gun.

Officer Schlosser testified regarding the difficulties officers face in responding to calls. He stated that people can be uncooperative, and officers may lose their train of thought. Upon later viewing the video, he believes it can be possible to identify people a block away who should have been interviewed.

Based on his review of the videos and his experience and training, Officer Schlosser testified that Officer Hoover performed correctly according to her training. He said if an officer believes a weapon is present, "we want to do a pat down."

He further testified that the area is a high crime area where there have been multiple shootings at all times of day. Therefore, it is appropriate for an officer to be on higher alert. He testified it is appropriate to search juveniles because they tend to be carrying firearms and may be part of hybrid gangs. He also testified that Officer Gudenkauf should have patted down the women he confronted on the scene.

Having reviewed the video, Officer Schlosser testified that Defendant was not being aggressive, was not making any verbal threats, and did not make any furtive movements to flee the area. Officer Schlosser testified:

> Q. So, you're telling this court that your policy and your training experience is just because somebody called in and said there was a gun in the area, that that is what justifies a pat down for weapons?
>
> A: I wouldn't say it's our departmental policy. It's a procedural thing when officers respond to a scene of an alleged crime or an incident and a gun is involved or even a knife—if a person is called for a person waving a knife, people in that area are going to do a pat down for weapons. And in this case, [Defendant] did, indeed, have a weapon on him.

(Schlosser Nov. 29, 2018 Hr'g Test.) Officer Schlosser also testified that if a seventy-year-old woman was "involved," she would be patted down.

### III. ANALYSIS

**A.** *The Terry stop and pat down was not supported by reasonable suspicion of criminal activity.*

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (citing *United States v. Cortez,* 449 U.S. 411, 417 (1981); *Terry v. Ohio,* 392 U.S. 1, 9 (1968)) (internal quotations omitted). Officers may only conduct investigatory stops if they have reasonable suspicion that "criminal activity may be afoot." *Id*. (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)); *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015). Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified. *Patrick*, 776 F.3d at 954 (quoting *Cortez,* 449 U.S. at 417). A hunch does not constitute reasonable suspicion to justify a stop. *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (citing *Terry*, 392 U.S. at 27).

8

The Fourth Amendment usually requires police to obtain a warrant before conducting a search. *Maryland v. Dyson,* 527 U.S. 465, 466 (1999); *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002) (citations omitted). There is an exception to the warrant requirement that permits a limited search for a weapon if there is a reasonable suspicion that the suspect is armed and poses a danger to officers or others. *Terry,* 392 U.S. at 29. Officers must have an objectively reasonable suspicion that a person with whom they are dealing may be armed and dangerous, and that "criminal activity might be afoot" in order to conduct a protective search. *See United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011) (quoting *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000)). Reasonable suspicion is determined by the totality of the circumstances, in light of an officer's experience and training. *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006) (citing *Arvizu,* 534 U.S. at 273). "In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ortiz–Monroy,* 332 F.3d 525, 529 (8th Cir. 2003) (quoting *Cortez*, 449 U.S. at 418) (internal quotation marks omitted). Even innocuous actions may give rise to reasonable suspicion under the totality of the circumstances. *United States v. Condelee,* 915 F.2d 1206, 1209 (8th Cir.1990) (opining that "there could be 'circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot'") (quoting *Reid v. Georgia,* 448 U.S. 438, 441 (1980)). When justifying a particular stop, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (quoting *Terry*, 392 U.S. at 21).

Reasonable suspicion "is a 'particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *Cortez*, 449 U.S. at 417–18); *United States v. Thomas*, 249 F.3d 725, 729 (8th Cir. 2001).

In *United States v. Jones,* the Eighth Circuit considered whether an officer had reasonable suspicion to perform a stop-and-frisk in a high-crime area on a mild day when the defendant was wearing a hoodie and "clutching the front area of his hoodie pocket with his right hand." 606 F.3d 964, 965 (8th Cir. 2010). The officer testified that based on his training and experience he had reasonable suspicion to believe the defendant was holding a firearm against his body. *Id.* at 966. *Jones* held,

> In considering this argument, we find it remarkable that nowhere in the district court record did the government identify what criminal activity Officer Hasiak suspected. Rather, the government leaped to the officer safety rationale for a protective frisk for weapons, ignoring the mandate in *Terry* that there must be reasonable suspicion of on-going criminal activity justifying a stop before a coercive frisk may be constitutionally employed. See, e.g., *United States v. Hughes*, 517 F.3d 1013, 1019 (8th Cir. 2008); *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000). Here, in contrast to the vast majority of cases in which protective frisks have been upheld, (i) the officers did not have reasonable suspicion that Jones was engaged in criminal activity other than carrying a weapon, such as drug trafficking or theft; (ii) Jones did not panic or flee when Officer Hasiak approached; and (iii) Jones was forcibly detained and searched before he said anything suspicious or incriminating. Thus, the only suspicion Hasiak articulated was that Jones was carrying a gun.

*Id.* The instant case is similar to *Jones* in that Officer Hoover also "leaped to the officer safety rationale for a protective frisk" without reasonable suspicion of on-going criminal activity that could be articulated regarding Defendant.[1] In *Jones,* however, the officer

---

[1] I want to be clear that I am not second-guessing any of the officers involved regarding their perception of possible threats to officer and public safety which is and should be their legitimate concern. I find myself in the same position as the court in *Willowby v. City of Philadelphia*, which stated,
> I appreciate and value the officers' concern that these bystanders could have had weapons and [their] desire to remove any possibility that an armed individual in close proximity. . . . However, the state of the law in this country is such that law enforcement officers do not possess the necessary justification for a pat down search of an individual absent a warrant or probable cause for arrest unless they have an articulable suspicion that the individual is engaged in criminal activity and is armed and dangerous.

was able to at least articulate (however implausibly) the reasons he believed the defendant was carrying a weapon. Officer Hoover, on the other hand, forthrightly admitted that the sole purpose for the pat down of Defendant was safety. She apparently made no assessment of any "particularized and objective basis" for suspecting Defendant of criminal activity.

The *Terry* stop and pat down of Defendant presents another problem. As mentioned above, the evidence of what crime the Dubuque Police Department was responding to was scanty. The sight of a gun can be troubling under some circumstances. However, the record is devoid of any evidence regarding the circumstances under which the gun appeared. There are many innocent scenarios that could explain a gun's appearance: e.g., a hunter cleaning his gun, a person with a permit transferring a gun to her car, a plain clothes police officer whose weapon was for some reason visible. However, the mere report of a person with a gun does not, without more, lead to a reasonable suspicion that criminal activity is afoot. Here, none of the witnesses testified to anything more than that a gun had been sighted.

In *United States v. Pope,* No. 18-1264, 2018 WL 6442656, —F.3d— (8th Cir. 2018), the Eighth Circuit recently resolved the problem addressed by then Chief Judge Loken in his concurring opinion in *Jones*, at least so far as Iowa's concealed carry law is concerned. Judge Loken would have suppressed the evidence in *Jones* even if he concluded that the officer had reasonable articulable suspicion the defendant was carrying a concealed weapon because a significant portion of the general public may lawfully carry weapons under the Nebraska statute at issue. 606 F.3d at 968-69 (Loken, C.J., concurring). *Pope* held that carrying a concealed weapon under Iowa law is presumptively criminal subject to an affirmative defense under Iowa Code Section 724.4(1). 2018 WL 6442656 at *2. Thus, *Pope* held that the officer had reasonable

---

946 F. Supp. 369, 376 (E.D. Pa. 1996) (citations omitted).

suspicion that criminal activity was afoot based on his personal observation of the defendant concealing a weapon in his waistband. *Id.*

Unlike in *Pope* or *Jones*, there is no evidence to support the suspicion that Defendant was carrying a weapon—concealed or not—when Officer Hoover decided to pat him down. Under *Pope*, had there been reasonable suspicion that Defendant was concealing a gun on his person, Officer Hoover would have been justified in stopping and frisking him. *Id.* Rather, Officer Hoover proceeded with the stop and frisk based on the anonymous tip.

The United States Supreme Court has declined to adopt a firearm exception to *Terry* under which an anonymous tip that a person is carrying a gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. *Florida. v. J.L.*, 529 U.S. 266, 272 (2000). *Florida* reasoned:

> Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry*'s rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. See 392 U.S., at 30. But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. Several Courts of Appeals have held it *per se* foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. See, *e.g., United States v. Sakyi,* 160 F.3d 164, 169 (4th Cir. 1998); *United States v. Dean,* 59 F.3d 1479, 1490, n.20 (5th Cir. 1995); *United States v. Odom,* 13 F.3d 949, 959 (6th Cir. 1994); *United States v. Martinez,* 958 F.2d 217, 219 (8th Cir. 1992). If police officers may properly conduct *Terry* frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability

critical in *Adams* and *White,*[2] the Fourth Amendment is not so easily satisfied. Cf. *Richards v. Wisconsin,* 520 U.S. 385, 393–394 (1997) (rejecting a *per se* exception to the "knock and announce" rule for narcotics cases partly because "the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others," thus allowing the exception to swallow the rule).

The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk. Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, see *Florida v. Rodriguez,* 469 U.S. 1 (1984) (*per curiam*), and schools, see *New Jersey v. T.L.O.,* 469 U.S. 325 (1985), cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.

Finally, the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with *Terry,* to conduct a protective search of a person who has already been legitimately stopped. We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue. In that context, we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in *Adams* and *White* does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.

*Id*. at 272–74 (brackets in original) (internal parallel citations omitted). *Florida* prohibits a stop-and-frisk based solely on an anonymous tip of illegal possession of a firearm that lacks indicia of reliability. Even though carrying a concealed weapon in Iowa is presumptively illegal under *Pope*, *Florida* nevertheless prohibits a stop-and-frisk based solely on a tip of such illegal possession of a firearm without indicia of reliability. Accordingly, without indicia of reliability of the tip and articulable facts that tie

---

[2] The full citations for these cases are *Adams v. Williams,* 407 U.S. 143 (1972) and *Alabama v. White*, 496 U.S. 325 (1990).

13

Defendant with particularity to criminal activity, the stop-and-frisk is not supported by reasonable suspicion.

**B.   *The Terry stop and pat down was not supported by reasonable suspicion that Defendant was armed and dangerous.***

"A protective frisk is only warranted if specific articulable facts taken together with rational inferences support the reasonable suspicion that a party was potentially armed and dangerous." *United States v. Cotton*, 782 F.3d 392, 396 (8th Cir. 2015) (initial quotation marks omitted). Following a valid *Terry* stop, the officer may conduct a limited pat down search of the individual's outer clothing for the purpose of uncovering concealed weapons if the officer has a reasonable, articulable suspicion that the person is armed and dangerous. *Terry*, 392 U.S. at 30. This search must be conducted in the least intrusive means reasonably necessary to dispel the risk of danger to the officers. *Id.*; *United States v. Gilliam*, 520 F.3d 844, 847-48 (8th Cir. 2008).

Officer Hoover, as well as the Government's other witnesses, explained how, in their experience, initial reports regarding the description of a suspect could be incorrect or how circumstances may change to make those initial reports no longer correct. They observed, for example, that a gun could be passed from one person to another. Officer Schlosser explained how "tunnel vision" may lead officers to bypass a suspect carrying a gun. These observations are helpful in explaining why it would be reasonable to expand the scope of an investigation to include subjects distant from the reported disturbance or whose clothing or physical characteristics do not match the initial report. Under different facts, an officer might plausibly testify, based on this type of experience, why it was reasonable to search someone who did not match the initial description of a suspect. For example, if the initial description was of a man in a black shirt carrying a gun from a robbery, the furtive conduct of a man in a white shirt fleeing the scene and clutching his waistband might reasonably arouse the suspicion of criminal conduct afoot and that the subject is armed and dangerous—especially in light of an officer's experience and training about mistaken descriptions, multiple guns, or gun hand-offs. In my hypothetical, the

14

officer's experiences are part of the totality of the circumstances that inform her perception of the conduct of the subject.

By contrast, Officer Hoover's decision to frisk Defendant was not based on articulable facts supporting a suspicion that he was engaged in criminal activity or that he was armed and dangerous. Rather, Officer Hoover testified (and was supported by Officers Gudenkauf and Schlosser) that it was her preference and practice to pat down anybody she came in contact with in response to such a call for officer safety, even if the subject did not match the description. While her attention to safety is commendable (as Officer Schlosser pointed out), concern for safety does not obviate the need for identifying the "particularized and objective basis" for suspecting Defendant of criminal activity. *Ornelas*, 517 U.S. at 696.

As discussed above, *Pope* involved a Des Moines police officer who saw the defendant put a gun in the waistband of his jeans as he was leaving a party the officer was breaking up. 2018 WL 6442656 at *1. The officer could see the outline of the gun through the defendant's shirt as the defendant made his way to the door. *Id*. The officer stopped the defendant, handcuffed him, and disarmed him. *Id*. The defendant admitted he did not have a permit for the gun and was charged with being a felon in possession of a firearm. *Id*. The court first concluded the stop was justified because (1) the officer had reasonable suspicion that criminal activity was afoot after he saw the defendant put the gun in his waistband; and (2) carrying concealed in Iowa is presumptively criminal until the gun carrier produces a permit. *Id*. at *2. The court then addressed the frisk of defendant. *Id*. at **2-3. The court held that it is "reasonable to allow an officer to frisk someone whom the officer has lawfully stopped and whom the officer reasonably believes is armed." *Id*. at *3. Relying on *Terry*, the court reasoned that the purpose of a frisk is not to discover evidence, but to allow an officer to conduct an investigation "without fear of violence," and therefore, the frisk in *Pope* was necessary. *Id*. This was true even though the defendant was in handcuffs because a handcuffed person can still use weapons or handcuffs can fail. *Id*.

While *Pope* supports a police officer's broad latitude in deciding when to frisk suspects, it does not diminish the Fourth Amendment's reasonableness requirement. An officer's ability to frisk a suspect is only triggered when the suspect is *lawfully stopped,* and the officer *reasonably believes* the suspect is armed. *Id*. As discussed above, Defendant was not lawfully stopped because Officer Hoover did not articulate why she reasonably believed he was engaged in criminal activity or armed. Rather, Officer Hoover stopped and patted down Defendant merely because he was present in the vicinity of an alleged gun-sighting. This was not enough under the Fourth Amendment to support reasonable suspicion that Defendant was armed and dangerous.

C. *The fact that Defendant admitted having a gun immediately before he was frisked does not change the analysis.*

The Fourth Amendment inquiry as to whether a protective frisk was reasonable must focus on the circumstances confronting the officer when she made the decision to frisk. *Davis*, 202 F.3d at 1063. Conduct after an investigative stop begins cannot supply the reasonable suspicion needed to justify the stop. *Id. at* 1062 (citing *United States v. White,* 890 F.2d 1413, 1417 n.4 (8th Cir. 1989)). In addition, I must evaluate the constitutionality of the officer's conduct as of the moment she began the protective search. *United States v. Stewart*, 631 F.3d 453, 456 (8th Cir. 2011).

The video from Officer Hoover's body camera shows her announce her decision to conduct the protective frisk before Defendant stated he had a gun. The video from Officer Hoover's body camera clearly shows her telling Defendant, "I'm going to do a pat down, put your hands behind your back," and reaching to perform the pat down before Defendant said anything. Defendant began to comply with Officer Hoover's order while she was reaching toward him and as he mentioned the gun. Because Officer Hoover had made her decision and commenced the pat down before Defendant mentioned the gun, the fact that he made the statement does not change the analysis regarding the existence of reasonable suspicion that a crime was afoot or that he was armed and

16

dangerous. Therefore, reasonable suspicion was absent to support the decision to stop and frisk Defendant despite his statement regarding the gun.

## IV. CONCLUSION

Under the totality of the circumstances, I find that the *Terry* stop-and-frisk was not based upon reasonable suspicion of criminal activity that Defendant was armed and posed a danger to officers or others.

Therefore, **I respectfully recommend that Defendant's Motion to Suppress (Doc. 25) be GRANTED** and that the evidence relating to the gun found on his person and all statements Defendant made following Officer Hoover's announcement of her decision to pat down Defendant should be suppressed as fruit of the poisonous tree.

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(1) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 19th day of December, 2018.

_____
Mark A. Roberts
United States Magistrate Judge
Northern District of Iowa